**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**MITCHELL BUTLER,**

      **Petitioner,**

**vs.**                                          **CASE NO. 4:04cv189-MMP/AK**

**WALTER A. MCNEIL[1]**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION

This cause is before the Court on Petitioner's petition for writ of habeas corpus and supporting memorandum.  Docs. 1 & 2.  Petitioner is represented by counsel.  Respondent has filed his response with supporting exhibits, Docs. 12 & 13, and the time has expired for Petitioner to file a reply.  This cause is therefore in a posture for decision.[2]  Having carefully considered the matter, the Court recommends that the petition be denied.

---

[1]James Crosby is no longer the Secretary of the Florida Department of Corrections, and Walter McNeil, the new Secretary, is substituted in Crosby's stead as the proper respondent.

[2]Approximately one month after this case was filed, it was re-assigned to the undersigned after the Clerk determined that Magistrate Judge Sherrill had been assigned in error upon the opening of the case.  _See_ July 7, 2004, Docket Entry.

<u>**BACKGROUND**</u>

Petitioner was indicted for the second-degree murder of Bertha Ann Herring.  Doc. 13, Ex. A at 82-83.  Before trial, the State moved to prevent Defendant from commenting upon or eliciting testimony from Lawanda Hart regarding statements she had made to law enforcement officers shortly after the murder which implicated her father but which she later recanted.  Defense counsel summarized his intentions with regard to Ms. Hart's proposed testimony as follows:

> [I]f the State does not call her, I intend to call her as a witness and she will say....that I heard the knocking, I heard somebody call out "help me, help me," but she'll say that her father was home the whole time and was never gone, but again when I call her, I expect she will admit to having made this [prior] statement about [her father not being home at the time of the murder and about] the blood on [his] socks.  So I think it's relevant information.

Doc. 13, Ex. B at 12-13.  In counsel's view, Ms. Hart's testimony that she had made the prior inconsistent statement would not be hearsay since she herself would be reporting what she said on a certain date and the question would be "whether or not we believe her claim now that she just made it up because her biological mother put her up to it."  *Id*. at 16-17.

The court initially took the matter under advisement but returned to it later for additional argument.  *Id*. 276.  At that time, counsel for Defendant conceded that the statement would indeed be hearsay but argued for its admissibility under *Chambers v. Mississippi*, 410 U.S. 284 (1973), which, according to counsel, held that "due process considerations take precedence over the Evidence Code, and if you have some evidence that's exculpatory and if there is some corroboration, due process requires that the defendant be allowed to present that testimony to the jury."  *Id*. at 277 & 283.  After extensive argument, the court concluded that Ms. Hart's prior statement to law enforcement was admissible for impeachment purposes but that it did not have

the "reliability or the nexus with [the father] being in the trailer to put it in the category of

substantive evidence." *Id*. at 293.  The court limited the extent of counsel's impeachment,

however, by prohibiting him from eliciting any testimony regarding the father having blood on

his socks.  *Id*. at 294-97.

　　During the State's case in chief, two witnesses testified regarding DNA found at the

murder site and on Herring's body.  The first to testify was Anne Schmitz, who conducted a

polymerase chain reaction (PCR) DNA test.  Ms. Schmitz's qualifications consisted of a

bachelor's degree in chemistry and biology education, a one-year training program with FDLE,

and a sixty-four hour class at Roche Molecular Systems, the "company that supplies the kits."

*Id*. at 173.  Ms. Schmitz testified that a blood stain found on a glass fragment in the trailer "could

have come from Mitchell Butler."  *Id*. at 187-88.  She also found that Defendant was "included

as a possible donor" of DNA found under the victim's fingernails.  *Id*. at 189.  Finally, on the

stretch pants used to strangle Herring, Ms. Schmitz found a mixture of DNA which "could

have come from" Herring and Defendant.  *Id*. at 190.

　　Ms. Schmitz then described the type of DNA testing which she performed:

　　I look at particular areas and by looking at multiple areas, I can take these
　　frequencies of occurrence for this area and multiply it by the frequency of
　　occurrence of this area and this area and this area so that you are looking at being
　　more discriminating narrowing down the frequency of occurrence of this
　　particular combination of markers.

　　So it's a matter of narrowing down the percentage of the population that can
　　contribute for that combination of markers on those six different markers.

　　　　　　　　　　　　　　* * *

　　[When I talk about statistics and frequencies of DNA] what I'm talking about are
　　the frequency of occurrence or the chance of a particular marker type showing up
　　in the population like for maybe–an example of that would be like for a particular

type it may be 1 out of 10 people that has this type.  So that would be how often it's going to show up.  One out of 10 people would have that type.

And I can take the frequency or that 1 out of 10, I can take that for the different markers and use that information collectively to get even a lesser occurrence in the population.  Say maybe one of those markers may be 1 out of 10, but when I do my calculation, I may come out with a number like 1 in 100 or 1 in 1,000 as to the combination of those five or six.

*Id*. at 191-93.  To determine the frequency of occurrence, Schmitz used a chart  provided by

Roche Molecular Systems.  *Id*. at 193.  She elaborated:

The chart that I do use is provided from Roche Molecular Systems and that is based on sampling and they go through procedures to produce these charts and to provide frequencies of occurrence for these particular types.

I can use that chart then and get the frequency of occurrence for my particular marker type, take that one, find it on the chart, and then the next one and plug it in, plug it in, plug it in and multiply across.  That's all it is is multiplying across to determine the frequency of occurrence of that combination of markers.

* * *

Roche Molecular Systems would have gone through a process of collecting samples, random samples from unrelated individuals and perform testing on those individuals and determine the frequency of occurrence of the types within those. They put those through tests to determine that they do meet certain standards and that they are not deviating from what would be expected in the population.

*Id*. at 193-94.

Schmitz stated that these charts are accepted within the scientific community.  *Id*. at 194.

She then reiterated her conclusions.  As to the blood found on the glass, Schmitz concluded that

the blood "could have come" from Petitioner and that the "chance that another unrelated

individual has this same combination of types is about 1 in 520,000 for the Caucasian population

and about 1 in 40,900 for the African American population and that is based on all six of those

markers."  *Id*. at 197-98.  As to the blood on the fingernail scrapings and on the gag, she found a

mixture of blood from the victim and Petitioner.  *Id*. at 198.  According to Schmitz, the "frequency of occurrence of types for that particular DQA1 for that mixture...is about 1 in 4 for the Caucasian population and about 1 in 9 for the African American population."  *Id*. at 199.

On cross-examination, Ms. Schmitz explained that while there may be hundreds or thousands of possible different markers, or "locations on the DNA molecule," she examined only six markers.  *Id*. at 201-02.  According to her, a person is "totally eliminate[d]" as a match if "they are different on only one of those six" markers.  *Id*. at 202.  Counsel then questioned her regarding the chart provided by Roche Molecular Systems:

Q      [W]hat Roche apparently has done is they've tested a certain number of
       individuals and found out what DNA patterns they have at these six
       different locations on the DNA molecule?

A      Yes.  They determine the frequency of occurrence of the different types
       possible for each of those six markers.

Q      And they actually went to different people and they got a sample of blood
       and they analyzed that sample of blood?

A      Yes.

Q      Do you know how many people were actually sampled for each of those
       data bases?

A      For the Roche statistics I believe it was around 200, roughly 200 for each.
       I'm not certain of that number.

Q      So when we talk about the likelihood of finding a match in the United
       States, for example, it's not as if they've tested everybody in the United
       States?

A      Everyone in the United States, no, has not been tested and put into this
       statistical chart.

* * *

Q       And then based on these 200 people they tested, they try and figure out the likelihood of finding a match in the rest of the world really.  Isn't that what it amounts to?

A       Yes....

*Id*. at 203-05.

The State then called a second DNA analyst, Karen Barnes.  Ms. Barnes, who performed a different DNA test on the samples, known as restriction fragment length polymorphism (RFLP), had a bachelor's degree in biology and had completed one-year of FDLE training, a four-week FBI course in forensic DNA testing, and a one-week course in PCR testing from Roche Molecular Systems.  *Id*. at 231-32.  In performing RFLP testing, Ms. Barnes examined five markers, or five "areas of the DNA," because "the more areas you look at, the more discriminating the test becomes."  *Id*. at 240.  Ms Barnes concluded that the "pattern from the glass and the right-hand fingernails matches Mitchell Butler and does not match Bertha Herring and the pattern from the male fraction of the vaginal swabs matches Mitchell Butler and does not match Bertha Herring."  *Id*. at 244.  In fact, Petitioner matched on all five markers for each of these samples.  *Id*. at 245-46.  Ms. Barnes then laid out "how many times in the population I would expect to find that same pattern through all five of those markers."  *Id*. at 246.  From the samples she examined, Ms. Barnes testified:  "I would expect to find those same patterns on those five markers in one in seventy-two billion Caucasians, one in twenty-two billion African Americans, one in six billion southeastern Hispanics, and one in one hundred sixteen billion in the southwestern Hispanics."  *Id*. at 246-47.  Ms. Barnes explained the "drastic differences" in her statistics and those of Ms. Schmitz as follows:

For the markers that are used in PCR...some of the markers only had three different types that a person could be, a type A, a type B or a type AB.

On the markers that I'm looking at, there are many, many more possibilities of different types, generally anywhere from up to 30 different band types which a combination of those...there are many more combinations; therefore, it's much more discriminating so there's less chance of another person having exactly the same pattern.

And then by comparing that to each pattern from each of those markers, it's even less likely that another person would have those same patterns in an unrelated individual.

*Id*. at 247. To arrive at her calculations, Barnes used population statistics from the FBI, and according to her, the method, figures, and statistics that she used are accepted within the scientific community. *Id*. at 247-48.

On cross-examination, Ms. Barnes stated that like the method of chart preparation done by Roche Molecular Systems, the FBI "looked at a limited number [of persons] and from that limited number have projected or theorized how likely it would be to find these patterns in the rest of the population of the world [.]" *Id*. at 253.

In closing arguments, the prosecutor highlighted the strength of the DNA evidence:

[Y]ou may recall also the DNA evidence with respect to the blood under the nails or the tissue especially with what Ms. Barnes testified to...because my recollection is that she testified that she did her tests in this case and her processes and she took a swabbing from fingernails from the right hand of the deceased and went through her process and isolated DNA and she went through those five markers and compared it to the standards that she had, the known blood of Mitchell Butler, and it was his.

Now, she couldn't say absolutely for sure, could she? They have not reached that point in DNA technology yet, I guess, but she gave us a frequency calculation that seems to me to pretty well say it's Mitchell Butler because she said that the chances of another person having that combination of five DNA markers would be one in twenty-two billion. That wasn't million. That was billion. One in twenty-two billion.

*Id*. at 510. The prosecutor acknowledged that defense counsel had "attempted to cast some doubt on the validity of these findings" but pointed out counsel's failure to challenge either Ms.

Schmitz or Ms. Barnes on the acceptance of the processes of DNA testing within the scientific

community.  *Id*. at 512-13.  He then pointed to the DNA witnesses' qualifications and their

credibility:

> Bear in mind these people are scientists.  You heard their degrees.
> You heard the training they talked about.  They work in a
> laboratory.  They talked about the accreditation that goes along
> with the laboratory.
>
> * * *
>
> [Defendant's] DNA is on this woman.  It's in her vagina.  It's
> under her fingernails.  It was in that trailer.  Now, those were really
> dramatic calculations.  Those were the instances where DNA was
> done and it went back to Mr. Mitchell on RFLP....
>
> There's no doubt in the world, I think and I suggest to you, that his
> semen was in her, his blood or some tissue was under her
> fingernails...and it was in that room in the trailer.
>
> * * *
>
> [B]ear in mind that this is science.  We're not going to be able to
> make scientists of you in two days, but certainly Ms. Schmitz was
> credible, was she not?  Ms. Barnes was credible, was she not....Did
> these people appear to be anything but well-educated professionals
> who knew what they were doing and who weren't exaggerating?
> They were perfectly willing to admit the points especially that Mr.
> Murrell brought up that might go to detract from their findings.
> They had no quarrel with them at all.  They came in here and gave
> their opinion.  They were strong in their opinions, but they weren't
> advocates by any means.

*Id*. at 513-17.

Defense counsel began his closing with a "couple of words about DNA":

> A lot of people put a lot of stock in DNA.  Obviously the State's witnesses do.
> Obviously you need to consider it.  Bear in mind, though, that there are
> limitations to DNA....They can't tell us with absolute certainty that only one
> person has this DNA pattern.

*Id*. at 543.  He then explained:

> To my mind it's like this.  If you're...in a house with a thousand rooms, you look in the first five and your friend is not there, well, then can you conclude that he's not in the other 995 rooms?  Well, not really, but that's what they're asking you to do with the DNA.

> [W]e have a match in these first five locations and we assume that we have a match in all these others.  Now, that's an oversimplification, but that is what's going on.  We're basing some assumptions on what we find on these first five locations.

*Id*. at 544.  He continued:

> Bear in mind, too, that when we talk about the probability of having a match, what they're doing is some sampling.  They've taken some samples from maybe 200 people...and based on those samples they're telling us what they think we would find if we check the population of everyone or check the DNA of everyone in the world.

> [A] lot of people put stock in this stuff.  It certainly has some value, but it's not infallible....

*Id*. at 544-45.

> In closing, the prosecutor stated:

> Mr. Murrell talked about the limitations on DNA and certainly the experts that came in here and testified to you recognized those limitations on DNA, but they also said every time I asked them, this is recognized in the scientific community.  These results are recognized as reliable.  Even though there's only 200 or so people out of each racial group that make up these samples that we generate our statistics from, they are considered reliable and...at some point...in everyday life we rely on experts.

> * * *

> Just because the technology hasn't gone as far as it could doesn't mean that we should ignore that technology that's there now today especially when every one of those scientists that testified here told you these results are reliable and they stood by their conclusions.

> * * *

> [I]f these results, if these DNA test results are not reliable, if they're somehow
> flawed, if the technology that's being used here just isn't something that you
> should rely on because of bad results or unreliable results, how is it...that in every
> analysis in which a result was reached whether it was PCR or the much more
> precise RFLP that Ms. Barnes talked about, every time the blood that was
> analyzed was shown to contain the DNA of either the defendant, Bertha Herring,
> or a mix of the two....
>
> [T]he fact that it happens over and over again corroborates every result.  These
> are reliable results and you can depend on them.  I suggest to you that you can
> depend upon them.  They were totally consistent every time, every time.

*Id*. at 562-63.

On December 13, 1996, the jury found Petitioner guilty of second-degree murder, Doc.

13, Ex. B at 593, and he was subsequently sentenced to life imprisonment.  Doc. 13, Ex. C.

Petitioner appealed, raising three issues:

1) the court erred in not admitting Lawanda Hart's prior statements as
substantive evidence under *Chambers* and in limiting her testimony regarding
blood on her father's socks;

2) the DNA statistical evidence was scientifically unreliable and should have
been excluded; and

3) the prosecutor made an improper, prejudicial comment during closing
arguments, thereby denying Petitioner a fair trial.

Doc. 13, Ex. D at ii-iii.  The court of appeal affirmed *per curiam* without written opinion.  Doc.

13, Ex. G.

Petitioner then filed a motion for post-conviction relief in state court.  Doc. 13, Ex. H.

On that occasion, Petitioner claimed that counsel was ineffective (1) for failing to object to the

DNA evidence and to the qualifications of the State's DNA witnesses, and (2) for failing to

object to "improper prosecutorial comments made during closing arguments which exploited the

significance of DNA matches."  Doc. 13, Ex. H.  Subsequently, the court heard oral argument on

the motion.  Doc. 13, Ex. I.  As the court framed the issue, it wanted to focus on the "issue of

prejudice" given that in case law "subsequent to this case, the population frequency testimony

that was presented as to the DNA evidence...probably was erroneous.  Probably if presented

today, would not be allowed."  *Id*. at 125.  Because of Petitioner's acknowledged presence at the

murder site, the court was concerned with whether Petitioner was prejudiced

> even assuming that the statistical information was erroneous, and what it would
> do would put him at the scene, which he admitted both in pretrial statements to
> the police and in his testimony at trial....
>
> [T]hen, of course, the next issue is assuming there was some prejudice, was it
> ineffective assistance of counsel not to challenge the testimony since at the time
> the law was that this testimony was allowable.

*Id*. at 126.

> Thereafter, in a lengthy ruling, the trial court denied Petitioner post-conviction relief.

Doc. 13, Ex. J.  In pertinent part, the court, after citing *Strickland*, stated:

> Defendant's first claim asserts that counsel was ineffective for failing to object to
> DNA evidence introduced at trial and the testimony based on this evidence.
> There are two steps in DNA testing.  The first step is the actual DNA matching
> test of the samples that have been collected.  The court record indicates that the
> FDLE lab used two methods called PCR...and RFLP...to match certain portions of
> the DNA strand from the defendant to certain portions of the DNA strand in the
> blood and semen samples collected at the scene.
>
> The second step in DNA testing is to determine what the statistical chance is of
> another member of the population having the same matching strand of DNA
> markers based on population frequency statistics.  In this case, one of the experts
> relied upon a database compiled by Roche Molecular Systems and the other
> expert relief on figured compiled by the Federal Bureau of Investigation (FBI).
>
> It is unclear from the motion whether the defendant is alleging that counsel
> should have objected solely to the PCR or RFLP DNA test evidence or to the
> statistical portion of the DNA test itself.  [Under Florida law], DNA test results
> are generally accepted as reliable in the scientific community, provided that the
> lab has followed testing procedures to protect against false readings and
> contamination.  The State's witnesses testified as to the testing procedures utilized

to protect against false readings and as to the general acceptance of the testing methods within the scientific community.  As such, if Defendant is alleging that counsel was deficient for failing to object solely to the PCR or RFLP DNA test evidence, Defendant's claim is denied as without merit as there was no basis for an objection.  Without a deficient act by counsel, the defendant has failed to carry his burden under <u>Strickland</u>.

If Defendant is challenging the statistical portion of the DNA test evidence, the claim is also denied on the basis that no deficient conduct has been shown. Defendant cites to a large amount of case law in support of his argument that came into existence **after** the conviction in the case at hand.  Because the law is not an exact science, an attorney should not be held liable for an error of judgment on an unsettled proposition of the law.  The use of case law not known at trial in support of an ineffective assistance of counsel claim is inappropriate. Additionally, the giving of legal advice that later is proven to be incorrect does not necessarily fall below the objective standard of reasonableness.  In the instant case, counsel's interpretation of the case law at the time of Defendant's trial cannot be said to have been unreasonable in light of the uncertainty of the law.

*Id*. (citations omitted) (emphasis in original).  The court then analyzed Florida case law "as it existed at the time of this trial in determining whether the conduct of counsel was unreasonable at the time it was given," concluding that at the time of Petitioner's trial, "there was a split in the districts as to the predicate needed to establish the validity of the statistical analysis in DNA cases."  *Id*.  Thus, "[b]ased on the case law available at the time of trial, counsel's failure to object to the admissibility of the statistical evidence was not measurably below the standards of practice at the time."  *Id*.

The court continued:

The defendant's second claim alleges that counsel was ineffective for failing to object to prosecutorial comments made in regard to the DNA evidence in his closing arguments.  As discussed...because the state of the law was uncertain as to the proper method for reporting DNA testing, counsel's failure to object to the prosecutor's statements was not deficient conduct.

*Id*.

The court next examined whether Petitioner was prejudiced by counsel's conduct:

Defendant has also failed to sustain the prejudice prong under <u>Strickland</u>.
Defendant is required to show that but for counsel's act or omission, the outcome
of the trial would have probably been different.   The court record indicates that
other evidence was introduced to place Defendant at the scene of the crime.
Specifically, Defendant's palm print in blood was found next to the victim's
body.   The defendant also made contradictory statements to law enforcement
regarding his presence at the scene of the crime prior to trial....There was
unrebutted evidence presented at trial, including the defendant's own testimony
that placed the defendant at the scene other than the DNA evidence.   Therefore, it
is hardly likely that the admission of the statistics contested in this motion are
likely to have changed the outcome of the trial.

*Id*. (citations omitted).  The court then turned to Petitioner's final argument:

The defendant does not convincingly assert that the testimony as to the DNA
match itself was inadmissible or that the statistical information presented changed
the outcome of the case.   The essence of defendant's real argument is that had the
defense counsel objected to the statistical information, the case ultimately would
have been reversed on appeal.   This argument asks the court to make a series of
assumptions....The Court declines to make these various assumptions.  Mr. Butler
was represented at trial by a distinguished and able trial attorney.   The defendant
did not receive perfect representation, certainly in hindsight there are other things
that Mr. Murrell might have done.   However, a defendant is not entitled to perfect
representation, he is entitled to reasonably effective representation.   The
defendant certainly received at least reasonably effective representation in this
case.

This motion does not present a situation where the facts are disputed....The
defendant has failed to sustain his burden of showing a prima facie case that but
for counsel's failure to object to the population frequency statistics and the
prosecutor's closing argument, the outcome of the trial would have been different.

*Id*.

Petitioner appealed the lower court's decision, which was affirmed *per curiam* without

written opinion.  Doc. 13, Ex. M & N.

The instant motion ensued.  On this occasion, Petitioner, who is represented by counsel,

raises three grounds for relief:

(1)  the trial court erred in admitting and/or counsel was ineffective for failing to
object to the State's DNA evidence;

(2)  the trial court erred in admitting and/or counsel was ineffective for failing to object to the prosecutor's closing argument; and

(3)  the trial court erred in not admitting Lawanda Hart's prior statements as substantive evidence under *Chambers* and in limiting her testimony regarding her father's having blood on his socks.

Doc. 1 at 6-8.

## **DISCUSSION**

Under 28 U.S.C. § 2254, a federal court may grant habeas corpus relief only if the state court adjudication

(1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under the "contrary to" clause of § 2254(d), "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).  "A state-court decision will certainly be contrary to...clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams*, 529 U.S. at 405.  A state-court decision will also be contrary to clearly established Supreme Court precedent "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Court's] precedent." *Id*. at 406.

Under the "unreasonable application" clause of § 2254(d), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. The federal court considering a habeas petition "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 412.

Settled circuit court precedent interpreting Supreme Court decisions is not determinative of clearly established federal law. Instead, this Court must look to the specific holdings of Supreme Court cases themselves. If the Supreme Court has not issued a specific holding on the issue at hand, then the state court's decision is not contrary to or an unreasonable application of clearly established federal law. *Carey v. Musladin*, ____ U.S. ____, 127 S.Ct. 649, 654, 166 L.Ed. 2d 482 (2006).

Further, in reviewing the decision of the state court, this Court must presume that the state court's factual determinations are correct, and the petitioner bears the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001).

The fact that the appellate court does not write "an opinion that explains the state court's rationale," does not detract from the deference owed to that court's decision. *Wright v. Secretary for the Department of Corrections*, 278 F.3d 1245,1255 (11th Cir. 2002). Under § 2254, the Court is to focus on the result of the state proceeding, not the reasoning underlying it, since all

that is required for a state-court adjudication on the merits is a rejection of a claim on the merits, not an explanation. *Id*. at 1254-55.

Because two of Petitioner's claims involve ineffective assistance of counsel, a review of *Strickland v. Washington*, 466 U.S. 668 (1984), is appropriate.

To prevail on a constitutional claim of ineffective assistance of counsel, a defendant must demonstrate (1) that his counsel's performance was below an objective and reasonable professional norm, and (2) that he was prejudiced by this inadequacy. *Strickland*, 466 U.S. at 686. The court may dispose of the claim if a defendant fails to carry his burden of proof on either the performance or the prejudice prong. *Id*. at 697. The court need not address the adequacy of counsel's performance when a defendant fails to make a sufficient showing of prejudice. *Id.; see also Tafero v. Wainright*, 796 F.2d 1314, 1319 (11th Cir. 1986).

With regard to the performance prong of *Strickland*, a defendant must provide factual support for his contentions that counsel's performance was constitutionally deficient. *Smith v. White*, 815 F.2d 1401, 1406-07 (11th Cir. 1987). The court must consider counsel's performance in light of all of the circumstances at that time and indulge in a strong presumption that counsel's conduct fell within the wide range of reasonably professional assistance. *Strickland*, 466 U.S. at 689-90. To show counsel's performance was unreasonable, a defendant must establish that "no competent counsel would have taken the action that his counsel did take." *Grayson v. Thompson*, 257 F.3d 1194, 1216 (11th Cir. 2001) (emphasis omitted). This standard is objective, and "it matters not whether the challenged actions of counsel were the product of a deliberate strategy or mere oversight." *Gordon v. United States*, 496 F.3d 1270, 1281 (11th Cir. 2007). "The relevant question is not what actually motivated counsel, but what reasonable could have motivated counsel." *Id*. When the court "can conceive of a reasonable motivation for counsel's actions," it

can deny the claim of ineffectiveness without evidentiary hearing. *Id*. "An ambiguous or silent record is not sufficient to disprove the strong and continuing presumption...that [counsel] did what he should have done and that he exercised reasonable professional judgment." *Chandler v. United States*, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (en banc), *cert. denied*, 531 U.S. 1204 (2001). "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000). There are no "absolute rules" for determining whether counsel's actions were indeed reasonable, as "[a]bsolute rules would interfere with counsel's independence–which is also constitutionally protected–and would restrict the wide latitude counsel have in making tactical decisions." *Putnam v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001). "To uphold a lawyer's strategy, [the Court] need not attempt to divine the layer's mental processes underlying the strategy." *Chandler*, 218 F.3d at 1315 n.16. "No lawyer can be expected to have considered all of the ways [to provide effective assistance]." *Id*. Quite importantly,

> If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed and that the lawyer's pursuit of course A was not a deliberate choice between course A, course B, and so on. The lawyer's strategy was course A. And [the Court's] inquiry is limited to whether this strategy, that is, course A, might have been a reasonable one.

*Id*.

To show prejudice, a defendant must show more than simply that counsel's unreasonable conduct might have had "some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. Instead, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A "reasonable probability is defined as a probability sufficient to undermine confidence in the

outcome." *Id*.  Additionally, prejudice is established only with a showing that the result of the

proceeding was fundamentally unfair or unreliable.  *Lockhart v. Hill*, 506 U.S. 364, 370 (1993).

Finally, the Eleventh Circuit has recognized that given the principles and presumptions

set forth above, "the cases in which habeas petitioners can properly prevail...are few and far

between."  *Chandler*, 218 F.3d at 1313 (11th Cir. 2000).  This is because the test is not what the

best lawyers would have done or even what most good lawyers would have done, but rather

whether a reasonable lawyer could have acted in the circumstances as defense counsel acted.

*Williamson v. Moore*, 221 F.3d 1177, 1180 (11th Cir. 2000), *cert. denied*, 534 U.S. 903 (2001).

1.  "Trial counsel was ineffective for failing to object to the DNA evidence
    introduced at Petitioner Butler's trial."[3]

In this claim, Petitioner more specifically charges that counsel was ineffective for failing

to object to the introduction of the DNA evidence because (1) neither of the State's DNA

witnesses was qualified to testify regarding the population frequency statistics each one used,

and (2) the PCR test was not generally accepted in the scientific community.  Doc. 1 at 6.

Though the issue of the witnesses' qualifications was put before the state court in the post-

conviction motion, it was not explicitly ruled upon.  However, it is clear from the Court's

conclusions that counsel did not act deficiently in failing to challenge the statistical portion of

the witnesses' testimony that it implicitly had to conclude that counsel did not act deficiently in

failing to challenge their qualifications.  That conclusion is entitled to deference unless it violates

§ 2254(d).

---

[3]As previously noted, the petition phrases this issue as a trial court error for admitting the
DNA evidence "and/or" as an ineffective assistance of counsel error for failing to object to the
DNA evidence.  In his memorandum, he concentrates on the ineffective assistance claim,
relegating the alleged evidentiary error to a footnote without discussion.

The state court specifically concluded that counsel did not act deficiently in failing to challenge the statistics used by the witnesses because the law was in a state of flux at the time of Petitioner's trial and there was a split in the districts "as to the predicate needed to establish the validity of the statistical analysis in DNA cases."  Petitioner claims that this was an erroneous conclusion because Florida law requires a trial court to follow the decisions rendered in its own district, rather than those in another district.  According to Petitioner, the First District Court of Appeal, the district in which instant Petitioner was tried, had found that the method by which the FDLE had arrived at population frequencies using FBI databases was not generally accepted in the relevant scientific community, and thus, this was the appropriate case under which counsel should have challenged the statistical evidence.  *See Vargas v. State*, 640 So.2d 1139 (Fla. Dist. Ct. App. 1994) (questioning validity of statistics).

The problems with this argument as it concerns counsel's performance are multiple.  First, *Vargas* involved a defendant of Puerto Rican descent, not a defendant of African-American descent as in this case.  Second, *Vargas* had been quashed by the Florida Supreme Court on other grounds before Petitioner's trial, and thus, the supreme court did not address the issue of whether the court's ruling regarding the statistics was correct.  Third, the case from the Second District Court of Appeal which had reached the opposite conclusion of the *Vargas* court and upheld the validity of the statistics, *Brim v. State*, 654 So.2d 184 (Fla. Dist. Ct. App. 1995), did involve a defendant of African-American descent, see *Brim v. State*, 779 So.2d 427 (Fla. Dist. Ct. App. 2000), and had been certified to the supreme court based on the conflict with *Vargas* but was pending decision.  With *Vargas* having involved a defendant of different descent from instant Petitioner and then having been quashed on grounds other than the DNA evidence, for

counsel to have looked to *Brim* would not have been unreasonable.  Thus, the court's conclusion that counsel did not violate the deficiency prong of *Strickland* was not contrary to or an unreasonable application of *Strickland*.

Even if counsel's failure to challenge the qualifications of the witnesses is an issue which "falls outside of § 2254(d)(1)'s requirement that [the Court] defer to state court decisions that are not contrary to, or an unreasonable application of, clearly established federal law," *Davis v. Secretary for Department of Corrections*, 341 F.3d 1310, 1313 (11th Cir. 2003), the Court does not believe that counsel was ineffective in that regard. Petitioner's argument is that neither witness was "qualified to report the population frequency statistics that were given" because one of them "did not know the exact population tested by the FBI in gathering its database" and the other "blindly plugged numbers into a chart provided by the Roche labs."   In this Court's view, this is not really an attack on the witnesses' qualifications but rather on the weight to be given their conclusions.  In forming an opinion, an expert witness is absolutely entitled to rely on matters not necessarily within her personal knowledge.  *See*, *e.g*., Fla. Stat. Ann. § 90.704 (facts or data upon which expert based opinion or inference may be those perceived by or made known to expert at or before trial; if facts or data are of type reasonably relied upon by experts in subject to support opinion expressed, facts or data need not be admissible in evidence).  The fact that neither chart was generated by these witnesses or others in the FDLE does not mean that the witnesses were not qualified to express an opinion on the DNA evidence but rather that their testimony perhaps was not entitled to the weight that the State desired or that the bases of the opinions were questionable.  In short, whether the witnesses were qualified to express their opinions is a matter totally separate from whether the bases of their opinions were viable.

The court did not end its analysis with its conclusion that counsel did not act deficiently regarding his failure to challenge the DNA evidence.  Instead, it looked also to whether the outcome of the trial would have been different if counsel had successfully excluded the DNA evidence.  In that regard, the court found that the record "indicates other evidence was introduced to place Defendant at the scene of the crime," including his bloody palm print next to Herring's body, his contradictory statements made to law enforcement, and his admission that he had sex with the victim, that they had gotten into a fight, and that he had hit her with a pipe.  Though he denied then strangling her and placed the blame for the murder on an unidentified male who was also at the trailer.  In the state court's view, this "unrebutted evidence," even without the DNA evidence, placed Petitioner at the scene of the crime.

Having carefully considered the matter, the Court agrees that even if counsel should have challenged the DNA evidence on the grounds alleged, there is not a reasonable probability that the outcome of the proceeding would have been different.  First, it is highly speculative, given the state of DNA law at the time of trial, that the court would have flatly excluded the DNA evidence.  Second, even if it had, there was more than ample evidence, much of it from Petitioner's own mouth, to place him at the scene of the murder and to lead a reasonable jury to conclude that in a fit of rage, he not only hit the victim but also strangled her.

In the second portion of this claim, Petitioner claims that the PCR test was not generally accepted in the scientific community.  As the state court found. this argument overlooks the fact that at the time of Petitioner's trial, the PCR test was generally accepted in the scientific community, and while Petitioner may be corrected that since then, "[n]ot a single appellate court in Florida...has held that the PCR method used in Petitioner Butler's case is generally accepted in

a criminal trial," it does not alter the fact that counsel was operating under the state of the law as it existed in January, 1997, not as it later evolved.  It also overlooks the substantial evidence against Petitioner beyond the DNA evidence, and the state court's conclusion in that regard is supported by the record and thus, entitled to deference.

> 2.      "Trial counsel was ineffective for failing to object to the prosecutor's improper closing argument."

According to Petitioner, the prosecutor, in highlighting the DNA evidence in this case, effectively "offered his personal opinion as to the absolute validity of the DNA evidence, effectively equating the DNA evidence with Petitioner Butler's guilt."  The state court rejected this argument, first, because of the state of the law regarding DNA evidence, and second, because Petitioner was not prejudiced by the prosecutor's arguments given the other evidence against Petitioner.

The Court also thinks this argument overlooks other statements made by the prosecutor during closing argument which show that he too recognized the uncertain state of DNA evidence at the time.  For example, the prosecutor also pointed out that Ms. Barnes, one of the DNA experts, "couldn't say absolutely for sure" that the DNA found on and in Ms. Herring's body came from Petitioner because "[t]hey have not reached that point in DNA technology yet."  He also pointed out that he would be "the first to admit to you...that [the DNA evidence] in and of itself is not proof of guilt beyond a reasonable doubt...."  He also acknowledged that Petitioner's counsel had "cast some doubt or attempted to cast some doubt on the validity" of the experts' conclusions.  Certainly, in light of Petitioner's admission that he had sex with the victim, the prosecutor's suggestion that the there was "no doubt in the world" that Petitioner's "semen was in her" was not a personal opinion but one fully supported by the evidence.  The Court has

reviewed the entire argument and does not believe that objections to the statements noted were necessary or would have altered the outcome of the proceedings.  Counsel did in fact object to the prosecutor's argument regarding "possible doubt," a much more critical issue than these other statements extrapolated from the entire argument and taken out of context without reference to other statements made.

In short, the Court believes the state court's ruling is entitled to deference and does not violate § 2254(d).

3.      "*Chambers* error."

In this claim, Petitioner maintains that the state court erred in refusing to admit inconsistent statements made by Lawanda Hart as substantive evidence.  As noted previously, the court allowed some of Ms. Hart's statements for impeachment purposes only, and it specifically excluded others, particularly testimony that Ms. Hart's father had blood on his socks.

In *Chambers*, the Supreme Court conducted a very specific analysis to conclude that the defendant's due process rights were violated by the court's refusal to allow the defendant to impeach the testimony of McDonald, who had confessed to the murder at issue and then recanted that confession, and by its exclusion of evidence from three witnesses that McDonald had confessed the murder to them.  Subsequently, the Court recognized that *Chambers* represented "an exercise in highly case-specific error correction," and stated:

> Thus, the holding of *Chambers*–if one can be discerned from such a fact-intensive case–is certainly not that a defendant is denied "a fair opportunity to defend against the State's accusations" whenever "critical evidence" favorable to him is excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation.

*Montana v. Egelhoff*, 518 U.S. 37, 52-53 (1996).  The *Chambers* Court itself recognized the limited nature of its ruling, stating:

> [W]e establish no new principles of constitutional law. Nor does our holding signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures.  Rather, we hold quite simply that under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial.

*Chambers*, 410 U.S. at 302-03.

In this case, the record establishes that the relationships between and among Ms. Hart and various family members were filled with conflict and made her highly susceptible to undue influence as to the events of the evening as they did or did not involve her father.  Furthermore, there was no other independent evidence to link Hart's father to the Herring murder.  The court's conclusion, therefore, that Hart's statements did not have sufficient indicia of reliability to admit them as substantive evidence did not violate *Chambers*, and thus, it is entitled to deference.

## CONCLUSION

In light of the foregoing, it is respectfully **RECOMMENDED** that the petition for writ of habeas corpus, Doc. 1, be **DENIED**, and that this cause be **DISMISSED WITH PREJUDICE**.

**IN CHAMBERS** at Gainesville, Florida, this  *25th*  day of February, 2008.

*s/ A. KORNBLUM*

**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 10 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.